**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **Jerry Cox,** | |
| *Plaintiff*, | |
| v. | Case No. _____ |
| **Minto Development Corporation,** **Benhti Economic Development Corporation,** **777 Partners, LLC,** **Tactical Marketing Partners, LLC,** **LDF Holdings, LLC,** **Midaaswi, LLC,** **Ishwaaswi, LLC,** **MoneyLion, Inc.,** **ITMedia Solutions, LLC,** **Niizhwaaswi, LLC,** **Creditserve, Inc.,** *and* **Infinity Enterprise Lending Systems,** | Ad Damnum: **$22,000 plus Fees & Costs** |
| | **JURY TRIAL DEMANDED** |
| *Defendant*s. | |

## COMPLAINT & JURY TRIAL DEMAND

COMES NOW the Plaintiff, **Jerry Cox** ("**Mr. Cox**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **Minto Development Corporation** ("**MDC**"), **Benhti Economic Development Corporation** ("**Bedco**"), **777 Partners, LLC** ("**777 Partners**"), **Tactical Marketing Partners, LLC** ("**Tactical**"), **LDF Holdings, LLC** ("**LDF Holdings**"), **Midaaswi, LLC** ("**Midaaswi**"), **Ishwaaswi, LLC** ("**Ishwaaswi**"), **MoneyLion, Inc.** ("**MoneyLion**"), **ITMedia Solutions, LLC** ("**ITMedia**"), **Niizhwaaswi, LLC ("Niizhwaaswi")**, **Creditserve, Inc**. ("**Creditserve**"),

and **Infinity Enterprise Lending Systems** ("**Infinity**") (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Mr. Cox against the Defendants for violations of the ***Fair Credit Reporting Act***, 15 U.S.C. § 1681, *et seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331, as the FCRA is a federal statute.

3.      The Defendants are subject to the provisions of the FCRA and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

4.      Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action were caused by the Defendants and occurred within this District.

## PARTIES

### Mr. Cox

5.      **Mr. Cox** is a natural person residing in the City of Lakeland, Polk County, Florida, and a *Consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c).

### Bedco

6.      **Bedco** is an economic development corporation purportedly organized under the laws of the Native Village of Minto, and has a primary address of **205 Lakeview Dr., Suite 7, Minto, AK 99758.**

## MDC

7.      **MDC** is an Alaska corporation with a registered mailing address of **615 Bidwill Ave., Suite 303, Fairbanks, AK 99701.**

8.      **MDC's** Alaska registered agent is **Roxanne Frank, 938 Dennis Rd., North Pole, AK 99705.**

9.      **MDC** claims to be the owner of online payday lending website Minto Money, which operates from www.mintomoney.com.

10.      Minto Money makes loans to consumers, including those in Florida, at interest rates in excess of 700% annually.

11.      **Douglas William Isaacson** ("**Isaacson**") is the CEO of MDC and maintains an office at **615 Bidwill Ave., Suite 303, Fairbanks, AK 99701**.

12.      According to Isaacson's online resume on LinkedIn, his job as CEO entails overseeing engagement in "innovative growth sectors" which include "lending." **SEE PLAINTIFF'S EXHIBIT A.**

## 777 Partners

13.      **777 Partners** is a Delaware limited liability company, with a primary business address of **600 Brickell Ave, Suite 1900, Miami, FL 33131**.

14.      The Florida registered agent for 777 Partners is **Frederick A. Love, 600 Brickell Ave., Suite 1900, Miami, FL 33131.**

## Tactical

15.      **Tactical** is a Delaware limited liability company, with a primary business address of **600 Brickell Ave, Suite 1900, Miami, FL 33131.**

16.     Tactical is not licensed to conduct business in the State of Florida.

17.     The Delaware registered agent for Tactical is **Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808.**

## LDF Holdings

18.     **LDF Holdings** claims to be a wholly owned subsidiary of the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "**LDF Tribe**").

19.     The LDF Tribe claims that LDF Holdings operates from the second floor of a cigarette store called the Smoke Shop, located at **597 Peace Pipe Road, Lac du Flambeau, WI 54538. SEE PLAINTIFF'S EXHIBIT B.**

20.     The president of LDF Holdings is **Jessi Lee Phillips Lorenzo**, f/k/a Jessi Lee Phillips ("**Lorenzo**"). According to her LinkedIn profile, as well as information posted on LDF Holdings' website, Lorenzo is the president of LDF Holdings despite not being a member of the LDF Tribe. **SEE PLAINTIFF'S EXHIBITS C and D.**

21.     Lorenzo resides at **502 S. Fremont Ave., Apt. 1107, Tampa, FL 33606.**

## Midaaswi

22.     **Midaaswi,** doing business as **National Small Loan**, is a limited liability company that conducts online lending via its website, www.nationalsmallloan.com.

23.     Midaaswi is allegedly reachable at PO Box 632, Lac Du Flambeau, WI 54538.

24.     Midaaswi claims to be wholly owned by the LDF Tribe. **SEE PLAINTIFF'S EXHIBIT E.**

25.     Midaaswi does business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

### Ishwaaswi

26.     **Ishwaaswi,** doing business as **Radiant Cash**, is a limited liability company that conducts online lending via its website, www.radiantcash.com.

27.     Ishwaaswi is allegedly reachable at PO Box 1193, Lac Du Flambeau, WI 54538.

28.     Ishwaaswi claims to be wholly owned by the LDF Tribe. **SEE PLAINTIFF'S EXHIBIT F.**

29.     Ishwaaswi does business in the Middle District of Florida over the internet, via postal mail, via Automated Clearing House transactions, and over the telephone.

### MoneyLion

30.     **MoneyLion** is a Delaware corporation with a primary business address of **30 West 21st St., 9th Floor, New York, NY 10010.**

31.     The Delaware registered agent for MoneyLion is **National Registered Agents, Inc., 1209 Orange Street, Wilmington, DE 19801.**

### ITMedia

32.     **ITMedia** is a California limited liability company with a primary business address of **2800 Olympic Blvd., Suite 100, Santa Monica, CA 90404.**

33.     ITMedia's Florida Registered Agent is **Paracorp Incorporated, 155 Office Plaza Drive, 1st Floor, Tallahassee, FL 32301.**

### Niizhwaaswi

34.     **Niizhwaaswi**, doing business as **Loan At Last**, is a limited liability company that conducts online lending via its website, www.loanatlast.com.

35.     Niizhwaaswi is allegedly reachable at PO Box 1193, Lac Du Flambeau, WI 54538.

36.     Niizhwaaswi claims to be wholly owned by the LDF Tribe. **SEE PLAINTIFF'S EXHIBIT G.**

37.     Niizhwaaswi does business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

### Creditserve

38.     **Creditserve** is a California corporation with a primary business address reported as **137 N. Larchmont Blvd., Suite 705, Los Angeles, CA 90004**.

39.     Creditserve is not registered to conduct business in the State of Florida.

40.     The California registered agent for Creditserve is Christopher Chatham, **3109 W. Temple St., Los Angeles, CA 90026**.

41.     **Eric Welch** ("**Welch**") is a natural person and the owner and CEO of Creditserve.

**Infinity**

42.     **Infinity** is a business that operates at **4864 Sparks Blvd., Sparks, NV 89436.** However, the true corporate name, as well as its true place of business, may be unknown to Plaintiff at this time; Plaintiff will amend his complaint when a more accurate name and/or location for Infinity is discovered.

43.     **Christopher James Leyva** ("**Leyva**") is a natural person and the CEO and owner of Infinity and its related subsidiaries**.** He resides at **2565 Old Waverly Ct., Sparks, NV 89436.**

## FACTUAL ALLEGATIONS

### Usurious Loans Prohibited in Florida

44.     Section 687.071(3), Florida Statutes, renders loans made with annual interest rates greater than 45% a felony.

45.     Section 687.071(7), Florida Statutes, renders any such usurious loan unenforceable in Florida, stating: "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

46.     Thus, any person who willfully makes such a loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935). *See also Rollins v. Odom*, 519 So. 2d 652, 655 (Fla. Dist. Ct. App. 1988). *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

## Sovereign Immunity as a Defense to State Usury Laws

47.     In an attempt to evade prosecution under usury laws of states like Florida, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

48.     In such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

49.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

50.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership,

and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

51.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

52.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

53.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

54.     Attempting to circumvent state interest rate caps by fraudulently asserting tribal sovereign immunity has been found to constitute criminal conduct. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y).

## Minto Money Engages in Loansharking

55.     Minto Money makes loans to consumers at interest rates that vastly exceed the maximum legal rate in Florida, usually over 700% annually.

56.     The website of Minto Money states: "Minto Financial dba Minto Money is a wholly owned subsidiary of Benhti Economic Development Corporation ("**Bedco**"), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Native Village of Minto, a federally recognized sovereign American Indian tribe in Alaska."

57.     The Native Village of Minto (the "**Minto Tribe**") is a small, isolated, financially strapped American Indian tribe located about 75 miles northwest of Fairbanks, Alaska. It has approximately 223 enrolled members.

58.     Minto Financial and Bedco, in turn, operate under a "tribal lending license" signed by Shane Thin Elk ("**Thin Elk**"), the "commissioner" of the Minto Financial Services Licensing & Regulatory Commission. **SEE PLAINTIFF'S EXHIBIT H.**

59.     The "commission" has issued only one license in its existence: the one granted to operate Minto Money.

60.     The Minto Financial Services Licensing & Regulatory Commission was created immediately before issuing this lone license.

10

61.     The "commission" places no restrictions on interest rates charged to consumers, unlike Alaska state law which limits payday loans to $500 and caps fees at $75 for such a loan.

62.     Thin Elk is an attorney who previously lived in Omaha, Nebraska, and formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "PROTECTING Tribal Sovereignty." He is now the owner of Thin Elk Law in Green Bay, Wisconsin, where he lives.

63.     Upon information and belief, Thin Elk is not a member of the Minto Tribe; rather, he is an enrolled member of a different Native American tribe located thousands of miles from Alaska.

64.     Minto Money is not beneficially owned or operated by the Minto Tribe, but rather, it operates primarily for the benefit of non-tribal members like Isaacson.

65.     Thus, Minto Money is a "rent-a-tribe" scheme.

66.     The main function of the Minto Tribe is to appear, on paper at least, to control the lending operation so that Isaacson and his investors may use the specter of sovereign immunity as a way to ward off the consumers they victimize, as well as state and federal regulatory authorities.

**Minto Money Claims to be 'Trusted' Lender**

67.     Minto Money deceptively markets its loans to consumers, referring to its loans as "installment loans" and heavily emphasizing that they are not "payday loans," attempting to avoid the negative connotation associated with such high-interest loans. For example, the website of Minto Money claims "we are a trusted loan lender who wants to

help customers in need with any unexpected expenses. We are a quick loan service that practices excellent customer service. Our installment loans *are better than payday loans* because you can pay down the principal amount with each payment." (Emphasis added.)

68.     Despite such assurances, Minto Money lends money at annual interest rates that exceed 700%.

69.     Thus, the loans made by Isaacson, Bedco, and MDC, as Minto Money, are illegal and unenforceable in the State of Florida.

**Isaacson Runs Minto Money for his own benefit, not the Tribe's**

70.     The primary beneficiary of the Minto Money rent-a-tribe scheme is Isaacson, a past president of Credit Services, Inc., which was an affiliate of Trans Union LLC ("**Trans Union**").

71.     Isaacson was born in 1957 in Seattle, Washington, and is not a member of the Minto Tribe.

72.     Isaacson currently lives in North Pole, Alaska, about 12 miles south of Fairbanks. Isaacson formerly served as mayor of North Pole.

73.     Isaacson, via one or more entities controlled by him, acts as an agent or "authorized service provider" for Minto Money and obtains credit reports regarding consumers, purportedly for the exclusive end-use by Minto Money. Isaacson then contracts with outside, non-tribal members who perform underwriting analytics, customer service, collection duties, and all other related business functions.

74.     Bedco, the purported parent company of MDC, is also controlled by Isaacson. Isaacson claims on his LinkedIn profile to be the CEO of MDC.

75.     Domain Name Registration records show that Bedco's only website, www.bedco.us, is registered to Isaacson. **SEE PLAINTIFF'S EXHIBIT I.**

76.     When aggrieved consumers complain about Minto Money to consumer advocacy organizations such as the Better Business Bureau ("**BBB**"), Isaacson responds personally to the complaints, identifying himself as the "General Manager" of Minto Financial. **SEE PLAINTIFF'S EXHIBIT J.**

### Minto Tribe Signs Off on Sham 'Agent' Agreement With CRAs

77.     To successfully operate Minto Money, Isaacson, Bedco, and MDC access detailed consumer data maintained within the files of a number of ***Consumer Credit Reporting Agencies*** ("**CRAs**") which specialize in servicing the needs of the online payday loan industry, including Clarity Services, Inc. ("**Clarity**") and FactorTrust, Inc. ("**FactorTrust**"). FactorTrust's parent company is Trans Union, and Clarity's parent company is Experian Information Solutions, Inc. ("**Experian**") – two of the "Big Three" nationwide CRAs.

78.     Without access to the hundreds of datapoints maintained by these CRAs on each consumer – everything from employment, salary information, IP addresses utilized, credit card balances, checking account overdrafts, real estate values, frequency of changes of addresses, and much more – the detailed, computerized underwriting analytics utilized by Minto Money would be virtually impossible to perform.

79.     Before being allowed to obtain reports from Clarity and FactorTrust, the CRAs required Minto Money to establish subscriber accounts. Pursuant to the FCRA, the

CRAs were required to make reasonable efforts to verify the identity of new subscribers and ensure their reasons for reviewing consumer credit reports were legitimate.

80.     It would be unlikely that a CRA would be willing to sell reports to entities like MDC or Bedco, since the CRAs preform extensive "due diligence" on each new potential subscriber. Part of this due diligence includes an inspection of the business' physical location, and in the case of online businesses like Minto Money, an examination of the relevant websites. MDC's only website, www.mintodevelopmentcorp.com, is a WordPress template with stock photographs and simple placeholder content, like the section of its website titled "Services," which consists of stock photos and "Visit this page in the near future... ... We are developing exciting products and services!" **SEE PLAINTIFF'S EXHIBIT K.**

81.     Likewise, Bedco's website is nothing but stock photos and placeholder content. Its main page features a stock photo of a table and chairs with the text "Product / Service #1. Whatever your company is most known for should go right here, whether that's bratwurst or baseball caps or vampire bat removal. Learn More." **SEE PLAINTIFF'S EXHIBIT L.**

82.     In sum, Bedco or MDC would not, by themselves, qualify for a subscriber account with Clarity or FactorTrust. Even if the CRAs were willing to sell reports directly to Bedco or MDC, then those CRAs would have to disclose the true name of Bedco/MDC, their address, and phone numbers, in disclosures given to consumers.

83.     Thus, as part of its "rent-a-tribe" agreement, the Minto Tribe agreed to appoint Isaacson, through Bedco and MDC, as its "agents" or "authorized service

providers," meaning that Isaacson, Bedco and MDC were authorized to obtain consumer reports ostensibly *on behalf of* the Minto Tribe/Minto Money. The CRA agreements stipulate that the reports provided by the CRAs will only be used by the Minto Tribe, and Isaacson, Bedco and MDC would not use the reports themselves. In essence, Isaacson, through Bedco and MDC, certified to the CRAs that he was simply playing the role of mailman: picking up and delivering documents, and nothing else.

84.     In reality, the assurances of Isaacson, through Bedco and MDC, were meaningless, and he never intended to honor them. The agreements were simply ways to create a paper trail to make it *appear* that all parties were complying with the FCRA.

85.     Yet, the agreements were "win/win" scenarios for all parties involved:

a.  Isaacson, *vis-a-vis* Bedco and MDC, got access to the files of the CRAs and could therefore pull thousands of consumer reports monthly, enabling Isaacson and his non-tribal investors to make, and collect on, a larger number of 700% interest consumer loans. Inspectors for Clarity and FactorTrust made their investigations of "Minto Money" at offices operated and staffed by Isaacson and his partners and conspirators.

b.  The Minto Tribe profited, since they receive a 2% "fee" or "commission" on loan revenues, which are primarily underwritten from CRA data.

c.  The CRAs – who get paid per report – were able to send an independent inspector to offices operated and staffed by Isaacson and his partners and conspirators in the metropolitan Fairbanks area to document and photograph their offices, computer systems, employees, etc., resulting in a

positive inspection report for the CRAs have in their files should any legal or regulatory issues arise. This contrasts to the alternative of having an inspector visit a rural tribal lodge that has limited or no internet access, no offices related to lending, and no employees who take calls regarding loans or in any way facilitate any kind of loan business. This would almost certainly cause the inspector's report to recommend the applicant subscriber *not* be considered verifiable, resulting in significant lost revenue for the CRAs.

86.     The Minto Tribe is thus complicit in, and profits from, the façade that the tribe is the genuine end users of the reports. Isaacson, Bedco, MDC, and other non-tribal members were the true end users of the reports; the Minto Tribe had no use for ***credit bureau reports*** ("**CBRs**") on any consumers since they have no actual involvement in consumer lending.

87.     Isaacson, through Bedco and MDC, pays the invoices from Clarity, FactorTrust and other CRAs each month for all reports claimed to be sold to Minto Money.

88.     Tradeline data – *e.g.*, consumer payment data on loans made by Minto Money – is reported to Clarity and other CRAs by Isaacson and/or entities under his direct control and ownership.

## How Minto Money Underwriting is Performed

89.     Once obtained, data in the CBRs is analyzed by software produced by outside, non-tribal vendors. The vendors' sophisticated algorithms crunch the CRAs data

and assign a proprietary risk score to the applicant. Isaacson and his non-tribal investors unilaterally determine the minimum qualifying score for a loan approval, the interest rate, repayment terms, and all other meaningful aspects of the loan. The Minto Tribe has no say in these matters.

90.     If a consumer is approved and elects to take out a loan, then completed loan documents and details are transmitted to a Minto Tribe representative who *may* be physically located in Minto. The representative then electronically "reviews" the documents and provides "final approval" to the loan while, supposedly, on the Minto Tribe's soil.

91.     After the *pro forma* review by the Minto Tribe, the loan is funded with money under the express and direct control of Isaacson and his non-tribal investors. The Minto Tribe itself has no access to the bank accounts containing the working capital used to fund Minto Money loans. Isaacson then pays roughly 2% of the loan revenues to MDC, which, conveniently, he also controls. While MDC then uses these funds for tribal projects and provides assistance to tribal members, 98% of revenues are kept by Isaacson and his investors.

92.     However, because of the rubber-stamp approval occurring in Minto, Isaacson, Bedco, MDC and the Minto Tribe claim the Minto Money loans are made on the Minto Tribe reservation and subject exclusively to Minto tribal law.

### Isaacson, Bedco, MDC Obtain Credit Report Under False Pretenses

93.     On May 11, 2020, Isaacson, through Bedco and MDC, as agents or authorized service providers for "Minto Money," requested and obtained two CBRs

regarding Mr. Cox from Clarity. CBRs were requested and obtained from Experian as well. A record of the inquiries was logged by Experian. **SEE PLAINTIFF'S EXHIBIT M.**

94.     Clarity recorded these requests for Mr. Cox's CBR as "hard" inquiries, *i.e.*, an inquiry which becomes part of the consumer's credit report, is included in reports provided to other lenders about the consumer, and which is factored into the consumer's credit score.

95.     Experian made a record of the inquiry as having been initiated via Clarity, for Minto Money, 205 Lakeview Dr., Ste 7, Minto, AK 99758, (907) 798-7342. *Id.*

96.     Taken at face value, it would appear as if the inquiry was made by Minto Money, as the address disclosed is a building on tribal lands, albeit a building with no individual suites or suite numbers. In reality, the inquiry was made by Isaacson, through Bedco and MDC, in or around metropolitan Fairbanks.

97.     The Minto Tribe, MDC, Bedco and Isaacson also previously signed and submitted blanket certifications of permissible purpose to Clarity and Experian, falsely declaring Minto Money and the Minto Tribe – via their "service provider" or "agent" – needed reports to evaluate consumers for loans for which they had *already applied*. The Minto Tribe, MDC, Bedco and Isaacson knew that in many, if not all, instances, credit reports would be obtained prior to any potential permissible purpose existing, as only a small fraction of Minto Money's web traffic comes organically. The lion's share of Minto Money's customers only become aware of the lender after direct solicitation by Minto Money – solicitations only made to consumers who fit Minto Money's underwriting

criteria, as ascertained by sophisticated analysis of the detailed credit reports provided by CRAs such as Clarity and Experian.

98.     Pursuant to the FCRA, 15 U.S.C. § 1681b(f), any person or entity requesting a CBR must have a permissible purpose for obtaining it. Any such person or entity requesting a report must also certify who is requesting the report.

99.     Isaacson, via Bedco and MDC, as Minto Money, certified to Clarity that they had a permissible purpose to obtain the report because Mr. Cox had *already initiated* a request for credit or some other business transaction directly with Minto Money.

100.    Isaacson, via Bedco and MDC, as Minto Money, further certified to Clarity, and thus, Experian, that the end user requesting the CBRs was "Minto Money, 205 Lakeview Dr., Ste 7, Minto, AK 99758, phone (907) 798-7342." *Id.*

101.    This address is a building used for school and senior lunch programs, community meetings, and village council operations. No call center, data center, or offices relating to any lending enterprise are found at this address. Indeed, the idea that any company relying on e-commerce to facilitate large numbers of transactions at 205 Lakeview Drive in Minto is dubious, at best, since the area lacks any high-speed internet service providers. DSL service is available, albeit at speeds of only 2 megabits per second.

102.    Despite the suite number of 7, no other suite numbers exist and the building does not contain offices divided into suites.

103.    The phone number (907) 798-7342 is not associated with Minto Money. The website of Minto Money states its phone number to be (844) 446-4686 (844-44MINTO).

104.    Thus, Isaacson, Bedco, and MDC obtained Mr. Cox's CBRs under false pretenses: by using a false address, a false phone number, and falsely certifying that this was the true address of the end user of the report, the purportedly "tribally owned" Minto Money in Minto, Alaska. The CBRs were actually used by Isaacson, his investors and his non-tribal contractors over a hundred miles away.

105.    Moreover, Mr. Cox did not apply for a loan or to transact business with Isaacson, Bedco, or MDC, nor did he consent to any credit report(s) being obtained regarding him by Minto Money or any related entity. Likewise, Mr. Cox made no such direct inquiry with Minto Money. Rather, Isaacson, through Bedco and MDC, obtained Mr. Cox's basic personal information – *e.g.*, his address, date of birth, employer, banking information, etc. – from an online payday loan lead generator.

106.    Many of these lead generators use misleading and false statements to hoodwink unsuspecting consumers into providing their personal information, which they then re-sell to illegally operating payday lenders like Minto Money that offer loans at triple-digit interest rates, or, in some cases, the leads are re-sold to other lead generators.

107.    By way of example, one such online payday loan lead generator was Zero Parallel, LLC ("**Zero Parallel**"). Zero Parallel, along with its owner, Davit Gasparyan, agreed to pay $350,000 in fines to the *Consumer Financial Protection Bureau* ("**CFPB**") in 2017; the CFPB alleged that Zero Parallel duped consumers into providing

personal information about themselves and then re-sold these leads to online payday lenders that it knew were operating illegally.

108.    Once the leads are purchased from an online lead generator, online payday lenders such as Minto Money then seek to qualify their leads by obtaining highly detailed credit reports on the consumer's spending and financial behavior from CRAs, and then use sophisticated predictive algorithms to determine which consumers may be financially distressed but retain the ability and willingness to make loan payments.

109.    Once located, the qualified consumer is bombarded with a flood of advertising emails, text messages, automated sales phone calls, and more, playing up the "quick and easy" loan terms offered, with no mention of the true cost of the loan.

110.    Isaacson, via Bedco and MDC, as Minto Money, rely on shadowy data brokers/lead generators to obtain the vast majority of their leads, on whom they pull detailed credit reports on, and to whom they market their services, provided the consumer's data fits the profile developed by Minto Money's non-tribal, *de facto* owners.

## Defendants are Subject to Jurisdiction of Florida Court

111.    Isaacson, via Bedco and MDC, as Minto Money, was aware he was requesting reports from Clarity, a CRA based in Clearwater, Florida.

112.    Isaacson, via Bedco and MDC, as Minto Money, was aware that he was requesting reports on a specific individual, Mr. Cox, who resides in Florida.

113.    Simultaneous to this, Isaacson, via Bedco and MDC, as Minto Money, was also conducting extensive business activities with ChexSystems, Inc. ("**ChexSystems**"), a Jacksonville, Florida-based CRA.

114.    Thus, at all times relevant, Isaacson, Bedco, and MDC, as Minto Money, were conducting extensive business activities in the State of Florida, with its two main consumer data sources both being within the State.

115.    Isaacson, Bedco, and MDC, as Minto Money, frequently lend money to consumers in Florida, transfer money to Florida consumers via Florida banks, and then enact electronic debits of those same Florida accounts.

116.    At all times relevant, Isaacson, Bedco, and MDC, as Minto Money, operated an interactive website that was frequently accessed by consumers in Florida relating to its payday loans.

117.    Operation of an interactive website like MintoMoney.com is a factor which tends to establish personal jurisdiction over a defendant in the forum state. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

118.    The conduct complained of by Mr. Cox – the procurement of his credit reports containing detailed, sensitive personal information – was done in Florida.

119.    Isaacson is operating as chief executive of Bedco and MDC, who used the information obtained via Clarity and Experian to find leads for his internet payday lending company.

## Zocaloans.com Purports to be a 'Tribal' Payday Lender

120.    Rosebud Lending LZO, doing business as ZocaLoans, is an online payday lender supposedly located in Mission, South Dakota, which purports to be owned by the Rosebud Sioux Tribe and operated on the tribe's reservation in South Dakota.

121.    ZocaLoans offers loans to consumers at interest rates of 700% annually and higher. For example, a loan made to a Hillsborough County, Florida, consumer for $700 showed a 738.81% annual interest rate, requiring repayment of $2,910.60 for a six-month loan. **SEE PLAINTIFF'S EXHIBIT N.**

122.    ZocaLoans claims it is owned by Rosebud Economic Development Corporation ("**REDCO**"), a tribally chartered entity with a principal place of business of 27565 Research Park Dr., Mission, SD 57555. ZocaLoans claims its loans are made under "tribal" laws – which, conveniently, permit online loansharking – and the Rosebud Sioux Tribe, as a federally recognized Indian Tribe, is entitled to sovereign immunity from criminal prosecution under Florida law.

123.    However, the idea that ZocaLoans is "tribally" owned is utter fiction. As detailed further below, 777 Partners, and its related non-tribal investors, are the true beneficial owners of ZocaLoans. The Rosebud Sioux Tribe simply claims ownership of the website as part of a "rent-a-tribe" scheme, and the tribe's involvement in the lending business is merely superficial. The tribe's only real contribution is providing a cloak of sovereign immunity as straw owners for 777 Partners, purportedly shielding them from criminal and civil charges.

124.    The Rosebud Sioux Tribe has a number of online payday websites, all of which charge consumer interest rates of at least 700% annually, including:

- AdvanceMeToday.com, owned by "Rosebud Lending AMT"

- FirstPayLoans.com, owned by "Rosebud Lending BHL"

- MyQuickWallet.com, owned by "Rosebud Lending DRT"

- ZocaLoans.com, owned by "Rosebud Lending LZO"

- PixyCash.com, owned by "Rosebud Lending PCL"

- QCredit.com, owned by "Rosebud Lending RQC"

125.    All of these websites contain or previously contained the same basic loan products and descriptive verbiage, with varying layouts and stock photos. Each one of the lending operations represents a "rent-a-tribe" scheme with a different, non-tribal investor or investors.

126.    Domain Name Registration records from 2019 show that zocaloans.com is registered to, and owned by, 777 Partners. **SEE PLAINTIFF'S EXHIBIT O.**

127.    REDCO's general manager, Mindi Jo Vavra ("**Vavra**"), moonlights as an executive for Fintech Financial, LLC ("**Fintech**"), a non-tribal, Delaware-based "warehouse lender" which provides working capital to make loans to consumers for several online payday lenders. One of these lenders is Plain Green, LLC ("**Plain Green**"), which makes loans at rates that exceed 250% annual interest and is purportedly owned by the Chippewa Cree Tribe of the Rocky Boy's Reservation in Montana.

128.    Plain Green operated a long-term rent-a-tribe agreement with Think Finance, LLC, which controlled virtually every aspect of its lending business. "Plain Green is a payday lending entity cleverly designed to enable Defendants to skirt federal and state consumer protection laws under the cloak of tribal immunity. That immunity is a shield, however, not a sword . . . Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc*., 922 F.3d 112, 128 (2d Cir. 2019).

**777 Partners and Tactical's Involvement**

129.    ZocaLoans receives funding from Fintech as well as 777 Partners, a private investment firm located in Miami, Florida. Through its subsidiary, Tactical, 777 Partners also provides the technological and data science infrastructure to underwrite loans by harvesting detailed information from consumer CBRs and using highly sophisticated algorithms to determine which consumers may be financially distressed but retain the ability and willingness to make loan payments.

130.    Like Minto Money, the key to ZocaLoan's success is the reams of data which are provided by CRAs that cater to online payday lenders, such as Clarity and FactorTrust. This data enables 777 Partners and Tactical to more accurately identify – and profit tremendously from – consumers who are seeking quick, easy, no-questions-asked loans without concern for their cost.

131.    Tactical is part of a common enterprise with 777 Partners. It shares the same office in Miami and is operated by the same individuals. Further, its primary function – and, likely, its only function – is to provide leads for ZocaLoans.

132.    When requesting credit reports from ChexSystems in its role as agent or authorized service provider for ZocaLoans, Tactical disclosed its identity as "TACTICAL MARKETING PARTNERS, LLC" in (Miami) Florida, 33131. **SEE PLAINTIFF'S EXHIBIT P.**

133.    Likewise, inquiries made from FactorTrust typically disclosed the requesting party as "Tactical/Zocaloans." **SEE PLAINTIFF'S EXHIBIT Q.**

134.    Trans Union records ZocaLoans inquiries as originating from "CUSTOMER 4029 via FACTORTRUSTTACTICAL LE-S, 600 Brickell Ave., Miami, FL 33131." **SEE PLAINTIFF'S EXHIBIT R.**

135.    The address 600 Brickell Ave, Miami, FL 33131 belongs to 777 Partners, as well as Tactical.

136.    Tactical is the "agent" or "authorized service provider" for the supposedly tribally owned ZocaLoans. Similar to Isaacson and Minto Money, Tactical's involvement is a win/win for all involved as well – Tactical/777 Partners get the reports they need, the Rosebud Tribe collects more commissions, and the CRAs are able to send their inspectors to an impressive skyscraper in downtown Miami, allowing for a positive verification of the identity of Tactical, resulting in the CRAs being able to sell hundreds of thousands of reports to Tactical/777 Partners yearly.

137.    Rosebud Lending LZO, REDCO, and Vavra knowingly signed off on false certifications to the CRAs that Tactical was their agent or authorized service provider but that Rosebud Lending LZO would be the actual end user of the reports. Rosebud Lending LZO, REDCO, and Vavra knew Tactical and its non-tribal contractors and consultants would be the *only* end users of the report, since Rosebud Lending LZO and REDCO play no role in the underwriting or approval of loans.

138.    Like Minto Money, loans predestined to be approved by Tactical and 777 Partners are electronically transmitted to an employee of Rosebud Lending LZO located on the Rosebud Tribe's reservation in South Dakota. After a cursory, *pro forma* review, the loan is granted "final" approval and thus, supposedly, originated by Rosebud Lending

LZO and protected under the auspices of tribal sovereign immunity. However, loans are funded by capital kept in bank accounts controlled by Tactical and 777 Partners, to which the Rosebud Tribe, REDCO, and Rosebud Lending LZO have no access. All material policies and procedures are instituted by Tactical and 777 Partners, without input from the Rosebud Tribe, REDCO, or Rosebud Lending LZO.

139.    On May 11, 2020, Tactical and 777 Partners obtained two CBRs regarding Mr. Cox from Clarity, and two from Experian. **SEE PLAINTIFF'S EXHIBIT M.**

140.    When Tactical and 777 Partners obtained Mr. Cox's CBRs, they falsely certified that the end user of the reports was ZocaLoans in Mission, South Dakota, when the end users were actually Tactical and 777 Partners in Miami.

141.    Mr. Cox never applied for any loan from Tactical, 777 Partners, Zocaloans, Rosebud LZO, or any related entity.

142.    The inquiries were made on May 11, 2020 – the same day of the inquiries made by Minto Money. Thus, upon information and belief, Tactical/777 Partners obtained Mr. Cox's basic personal information from the identical lead generator as Minto Money.

143.    Tactical and 777 Partners thus not only obtained Mr. Cox's CBRs without permissible purpose, they did so under false pretenses.

### National Small Loan's Evolution into a Purported Tribal Entity

144.    Around November 18, 2013, the website nationalsmallloan.com was registered; archived Domain Name Registration records show it was registered to Melissa

Drotar, 7257 NW 4th Blvd. #7, Gainesville, FL 32607, email melissa@nationalpayday.com. **SEE PLAINTIFF'S EXHIBIT S.**

145.    Nationalpayday.com was supposedly owned by Devidia II Ldta, which *claimed* to be located in Costa Rica. "Devidia II" appears to be an homage to the fictional planet Devidia II, referenced in *Star Trek: The Next Generation*.

146.    In reality, the business was beneficially owned by Aaron Taravella ("**Taravella**"), Oscar Rodriguez ("**Rodriguez**"), Jesus Diaz ("**Diaz**"), and other, non-Costa Rican investors.

147.    The address 7257 NW 4th Blvd.., #7, Gainesville, FL 32607 belongs to Westside Postal Express, a company that provides private post office boxes. National Pay Day operated out of an office at **4911 SW 91st Terrace, Suite A, Gainesville, FL 32608.** This is the same address used by Taravella for his business, Strategic Funding Partners, Inc. **SEE PLAINTIFF'S EXHIBIT T.** At one point, Strategic Funding Partners, Inc., did business as "Gainesville Title Loan."

148.    National Small Loan made payday loans from its website at rates exceeding 700% annually. Archived web pages from January 2015 show no indication that the website, at that time, claimed any kind of affiliation with a Native American tribe. In January 2015, National Small Loan's logo featured a blue-and-black stack of cash to the left, with the word "National" on one line and "SmallLoan.com" on a second:



149.    Web archives from 2015 show its business hours to be listed as 9am to 5pm Eastern Standard Time.  Not coincidentally, Gainesville, Florida, is in the **Eastern Time Zone**.

150.    Web archives from 2015 show the main customer service number for NationalSmallLoan.com was 877-778-8006 and its fax number was 866-513-0374. **SEE PLAINTIFF'S EXHIBIT U.**

151.    The identical phone and fax numbers can be found on the website of Nationalpayday.com **SEE PLAINTIFF'S EXHIBIT V.**

152.    In June 2015, the State of Washington, Department of Financial Institutions, Division of Consumer Services, fined Devidia II Ltda $4,750 for making illegal, unlicensed loans in Washington State, and ordered it to cease and desist.

153.    Shortly thereafter, National Small Loan began claiming it was owned by the LDF Tribe in rural Wisconsin, and it was operated from the second floor of a cigarette store called the Smoke Shop in Lac du Flambeau, Wisconsin.

154.    The LDF Tribe is a small, isolated, and economically depressed Indian Tribe located in rural Wisconsin.

## Origin of the LDF Tribe's Payday Lending Operations

155.    An article published in the LDF Tribe's newsletter, *Inwewin*, in July 2013 noted that the tribe had embarked on a new internet lending business. The article stated that "some view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations." The article also stated that "the Tribe has partnered with one of the largest and most experienced lending companies."

156.    Lacking both capital and experience, and in desperate need of money, the tribe attempted to rent out one of its few remaining assets – its sovereign immunity – to non-tribal persons and entities who agreed to pay the LDF Tribe a small percentage of each loan as a fee or commission.

157.    Within a short period of time, the LDF Tribe became one of the most prolific suppliers in the rental market for sovereign immunity, making "rent-a-tribe" agreements with over 50 different non-tribal investors.

158.    The LDF Tribe received between one and three percent of revenues from each of these lenders in exchange for the use of their name. Despite supposedly owning a multitude of payday loan websites, transacting tens of millions of dollars in total revenues per month, a feat which would require thousands of employees, each and every payday lending website purportedly owned by the LDF Tribe states its business office operated from the same small structure located at 597 Peace Pipe Rd., Lac Du Flambeau, WI 54538. **SEE PLAINTIFF'S EXHIBIT B.**

159.    After its "acquisition" by the LDF Tribe, money flowed in – and out – of National Small Loan through a maze of different shell companies, including Unified Analytics, LLC ("**Unified Analytics**"), and National Techmark, Inc. ("**National Techmark**"). Both of these companies operated from 4911 SW 91st Terrace, Suite A, in Gainesville and were owned by Taravella's long-time associates, Rodriguez and Diaz.

160.    Unified Analytics and National Techmark received more than $5 million from Ganador Enterprises, LLC, and Carl Ruderman ("**Ruderman**"). Unified Analytics and National Techmark used the money to fund "tribal" payday loans. Ruderman, through 1 Global Capital, LLC ("**1 Global Capital**"), raised millions of dollars from thousands of individual investors using a network of unlicensed and barred brokers, telling investors the money would be invested "safely" and used to make merchant cash advances.

161.    Ruderman, 1 Global Capital, Unified Analytics, and National Techmark were sued in 2018 by the Securities and Exchange Commission for fraud. 1 Global Capital's chief financial officer, Alan Heide, was sentenced to a five-year prison term in 2019 for his role in the fraud.

162.    Even though National Small Loan now claims to be located in Wisconsin, which is in the Central Time Zone, its website indicates hours of operation in Eastern Standard Time. Its logo also remains the same:



163.    The fax number 866-513-0374 is still used by **both** the "tribal" National Small Loan and non-tribal National PayDay as of August 2020. **SEE PLAINTIFF'S EXHIBITS V and W.**

164.    National Small Loan now purports to be owned by the tribal LLC, Midaaswi.

165.    The beneficial, non-tribal owners of National Small Loan became agents or authorized service providers for Midaaswi with respect to Clarity and Experian, with the knowledge, consent and direct participation of LDF Holdings and Midaaswi.

166.    Once again, everyone got what they wanted: the non-tribal owners of National Small Loan got access to the CBRs they need to underwrite loans, Midaaswi/LDF Holdings collected more commissions on loan revenue, and the CRAs were able to send inspectors to real offices staffed with real lending employees – likely under the control of Taravella – rather then send inspectors to the offices on the second floor of a cigarette shop in Wisconsin with no discernible activity relating to lending.

167.    Should any state or federal regulatory authority investigate the matter, everyone was covered. The CRAs could produce substantial documentation showing they had, indeed, verified their customer extensively. The non-tribal owners of National Small Loan could claim they were mere agents, performing a service for Midaaswi/LDF

Holdings. Lastly, Midaaswi/LDF Holdings could stonewall any investigation by claiming sovereign immunity.

168.    Loan underwriting followed the same, well-worn patterns as before. Loan approval was made by the non-tribal owners of National Small Loan. Electronic documents were transmitted to a Midaaswi/LDF Holdings representative on LDF tribal soil in Wisconsin, who rubber-stamped approval for the loan while technically on the LDF Tribe's reservation. The loans are then funded from bank accounts to which Midaaswi/LDF Holdings have no access, and the loans are serviced and collected by non-tribal entities off the LDF Tribe's reservation.

169.    On January 28, 2020, National Small Loan obtained a CBR regarding Mr. Cox from Clarity. Clarity then obtained supplemental data from Experian, who made a record of the inquiry. **SEE PLAINTIFF'S EXHIBIT M.**

170.    Clarity recorded the inquiry as a hard inquiry.

171.    The beneficial, non-tribal owners of National Small Loan, with the aid, knowledge and consent of LDF Holdings and Midaaswi, obtained the CBRs under false pretenses and without permissible purpose. The beneficial, non-tribal owners of National Small Loan claimed that Midaaswi was the actual end user of the report, although it had no use for the report as it was not involved in any meaningful way concerning loan underwriting. As in previous examples, Mr. Cox's personal information was purchased from an online lead generator, who itself had no consent to obtain any CBR regarding Mr. Cox.

172.    However, LDF Holdings and Midaaswi were compensated by the beneficial, non-tribal owners of National Small Loan for their complicity and authorization allowing CBRs to be pulled in their name. LDF Holdings and Midaaswi provided false blanket certifications to the CRAs claiming the beneficial, non-tribal owners of National Small Loan were their agents and were obtaining reports for LDF Holdings and Midaaswi to use even though LDF Holdings and Midaaswi knew they would not be using the reports. As such, LDF Holdings and Midaaswi are jointly and severally liable.

### ITMedia/'PersonalLoans.com' Obtains Report Without Permissible Purpose

173.    On August 30, 2018, Experian recorded a credit inquiry from "PERSONALLOANS.COM" regarding Mr. Cox. **SEE PLAINTIFF'S EXHIBIT M.**

174.    Mr. Cox never authorized any such inquiry by PersonalLoans.com. Mr. Cox discovered the inquiry upon reviewing his Experian consumer credit disclosure in June 2020.

175.    PersonalLoans.com had no permissible purpose to obtain Mr. Cox's Experian credit report. Beyond this, PersonalLoans.com obtained Mr. Cox's report under false pretenses, certifying to Experian that it had permissible purpose for "account review." Mr. Cox had no "account" with PersonalLoans.com, and it would be logically impossible for Mr. Cox to have such an account with PersonalLoans.com, as it is not a lender, but a buyer and seller of online payday loan leads.

176.   ITMedia owns and controls PersonalLoans.com. When requesting Mr. Cox's CBR, ITMedia claimed that the requesting party was "PERSONALLOANS.COM, 318 N CARSON ST, STE 208, CARSON CITY, NV 89701, phone 310-929-5566." *Id.*

177.   The Carson City, Nevada, address belongs to Paracorp Incorporated ("**Paracorp**"). No actual consumer lending business is conducted at this address and Paracorp is simply a professional registered agent, serving more than 1,000 businesses in Nevada.

178.   The phone number 310-929-5566 was formerly utilized by Cash Now, Inc., a payday lender that was incorporated in 2009 by Daniel Negari ("**Negari**"). Cash Now, Inc., merged with ITMedia in 2014. **SEE PLAINTIFF'S EXHIBITS X and Y.**

179.   PersonalLoans.com is a website that advertises "easy," short-term loans to consumers. The website is not a direct lender but rather a lead generator which collects consumers' personal information, *e.g.*, name, address, date of birth, Social Security number, employer, bank account, and related information.

180.   PersonalLoans.com claims that its affiliated lenders make loans at annual interest rates between 5.99% and 35.99% annually. Its webpage shows examples of the annual percentage rates charged by its affiliates, ranging from 12% to 24% annually. **SEE PLAINTIFF'S EXHIBIT Z.**

181.   In reality, PersonalLoans.com sells its harvested consumer data to many lenders who make loans at over 750% annual interest, including multiple supposedly tribal lenders.

182.   PersonalLoans.com itself claims tribal affiliation as well, claiming to be owned by Arrow Eagle, LLC ("**Arrow Eagle**") of Roosevelt, Utah. Arrow Eagle, in turn, claims to be owned by the Ute Tribe of Utah, a federally recognized Indian Tribe.

183.   This, too, is a work of fiction. PersonalLoans.com is beneficially owned and operated by Negari and his non-tribal partners and investors. The Ute Tribe's purported ownership of PersonalLoans.com is a variant of a "rent-a-tribe" scheme, whereby it provides cover for Negari, *et al.*

184.   Negari is a businessman living in Nevada who has a long and checkered history in the payday lending marketplace.

185.   Negari, through his many companies and subsidiaries, frequently engages in questionable – and often illegal – business practices. As but one example, the *Federal Trade Commission* ("**FTC**") and the *Small Business Administration* ("**SBA**") sent a "WARNING LETTER" to ITMedia on May 14, 2020, expressing concern that ITMedia's website, SBA.com – which is intentionally similar to the SBA's actual website, SBA.gov – was receiving commissions and making profit from referrals to lenders who supposedly could process Paycheck Protection Program ("PPP") loans for small businesses. **SEE PLAINTIFF'S EXHIBIT AA.**

186.   The FTC has also taken action against Negari and ITMedia for their involvement in online payday loan lead generation.

187.   In 2016, the FTC filed an enforcement action in the Central District of California against ITMedia regarding its failure to respond to the FTC's investigative demands. The FTC was investigating ITMedia for what it believed was questionable

methods in obtaining leads regarding consumers seeking online payday loans. The FTC also demanded information as to whom ITMedia sells leads. *Federal Trade Commission vs. IT Media Inc.*, case 2:16-cv-09483-CAS-MRW, Central District of California, Western Division, Dec. 22, 2016.

188.   The online resume of Amanda Eriksson, who worked at ITMedia from September 2017 through March 2019, states that ITMedia is the "official AOR (agency of record) for the web properties: Cashadvance.com, BadCreditLoans.com and Personalloans.com." She also refers to ITMedia as a "lead buyer." **SEE PLAINTIFF'S EXHIBIT BB.**

189.   Jason Ramin ("**Ramin**") is the chief executive officer at ITMedia. Ramin is also the author of multiple articles published on PersonalLoans.com's blog, most of which tout the purported advantages of consumers taking out online payday loans.

190.   Records from March 2017 show Experian recording inquiries relating to PersonalLoans.com which contained the following identification: "2800 OLYMPIC BLVD STE 100 SANTA MONICA CA 90404 *No phone number available*." **SEE PLAINTIFF'S EXHIBIT CC.**

191.   This address – 2800 Olympic Blvd., Suite 100, Santa Monica, CA 90404 – belongs to ITMedia and is also utilized by other entities owned and operated by Negari.

192.   ITMedia certified to Experian that it was requesting Mr. Cox's CBR for its own use, *e.g.*, ITMedia was the end-user and was not acting as a re-seller of reports.

193.   Logically, ITMedia could not possibly have been requesting the CBRs for its own purposes as, pursuant to PersonalLoans.com's own disclosures, it engages in no

direct lending. Thus, the only possible reason it would have obtained Mr. Cox's CBR was to re-sell such information about Mr. Cox, which it merged with data it obtained on its own, such as Mr. Cox's salary information.

194.    ITMedia was, and still is, acting as a *Reseller of Reports* from CRAs within the meaning of 15 U.S.C. § 1681a(u) in that it: (a) for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole, or in part, in the practice of assembling and merging consumer information contained in the database of another consumer reporting agency for purposes of furnishing such information to a third party; and, (b) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

195.    Since ITMedia was a reseller of credit reports, it was required by 15 U.S.C. §§ 1681e(e)(1)(A) and 1681e(e)(2)(A)(i) to disclose who the end users of the report were to Experian, the CRA from which Mr. Cox's report was obtained. ITMedia made no such disclosure and provided false certification to Experian that the report was for *its own use* and would not be used for any other purpose.

**Radiant Cash Buys Mr. Cox's Data from PersonalLoans.com, Obtains New Report**

196.    Within minutes of obtaining Mr. Cox's Experian credit history, PersonalLoans.com had re-sold Mr. Cox's personal information to Ishwaaswi, doing business as Radiant Cash.

197.    Radiant Cash, operating from radiantcash.com, is an online payday lender that lends to consumers at annual interest rates ranging from 400% to 800%. Radiant Cash claims to be owned and operated by Ishwaaswi, a subsidiary of LDF Holdings.

198.    However, MoneyLion is the true owner and operator of radiantcash.com.

199.    Decisions about all key aspects of the lending business – from who to buy leads from, which credit reporting agencies credit reports are obtained from, underwriting analytics, collection methods, marketing, and even factors like which states to lend money in – are made by MoneyLion, and not Ishwaaswi.

200.    Archived Domain Name Registration records show that on November 11, 2013, radiantcash.com was registered to **MoneyLion LLC**, 11 Patricia Way, Kendall Park, NJ 08824, phone (917) 971-6064, email dc@moneylion.com. **SEE PLAINTIFF'S EXHIBIT DD.**

201.    The "dc" in the email address is short for Diwakar Choubey, the CEO of MoneyLion.

202.    The address 11 Patricia Way, Kendall Park, NJ 08824 is Choubey's previous home address. The phone number (917) 971-6064 also belonged to him.

203.    Archives of MoneyLion's now-discontinued website, LionLoans (www.lionloans.com), show that when LionLoans was still active, it contained a contact address in the small town of Isabel, South Dakota. **SEE PLAINTIFF'S EXHIBIT EE.**

204.    A listing with the Better Business Bureau for MoneyLion also indicates an address in Isabel, South Dakota. **SEE PLAINTIFF'S EXHIBIT FF.**

205.    In 2014, a call center employing over 20 phone agents opened in Isabel, South Dakota, called Dakota Service Center; the CEO was Carol Laib ("**Laib**"). **SEE PLAINTIFF'S EXHIBIT GG.**

206.    Laib's online resume on LinkedIn states that she was the "Director of Operations-Radiant Cash" at the Dakota Service Center in Isabel, South Dakota, between April 2014 and September 2016; simultaneous to this, she states she held the position of Managing Director of Salt Lake City Operations at MoneyLion in Salt Lake City, Utah. **SEE PLAINTIFF'S EXHIBIT HH.**

207.    The online resume of Samantha Goldade indicates that she worked for MoneyLion between July 2014 and February 2018: first as a manager at its Dakota Service Center until July 2015, and then as a manager at MoneyLion.

208.    Thus, the Dakota Service Center was funded by MoneyLion and managed by MoneyLion employees.

209.    MoneyLion maintains offices in Kuala Lumpur, Malaysia, and New York City.

210.    The online resume of Christopher Loganathan, Software Architect, Selangor, Malaysia, indicates he worked on the Radiant Cash website while employed by MoneyLion as a Senior Software Engineer Team lead. **PLAINTIFF'S EXHIBIT II.**

211.    While at MoneyLion, Loganathan helped develop a "website which manages USA customers loan application via these websites… the first part which is the type of loans offered to customers. The loan products are called as RadiantCash and LionLoans." *Id.*

212.    Thinegan Ratnam is the Director of IT Infrastructure and Security at MoneyLion in Kuala Lumpur, Malaysia, and he also worked on radiantcash.com while employed with Money Lion. **SEE PLAINTIFF'S EXHIBIT JJ.**

213.    On his blog, Ratnam states, "Moneylion Inc, a short term loans provider. The company managed to release Moneylion.com, Lionloans.com, **Radiantcash.com**." *Id.*

214.    Radiant Cash's web server's IP address is 54.84.7.44, which corresponds to a physical location in Ashburn, Virginia, more than 1,000 miles from the LDF Tribe's reservation. **SEE PLAINTIFF'S EXHIBIT KK.**

215.    MoneyLion's loan underwriting follows the same template as the other LDF-affiliated payday lending websites: loan approval is made by MoneyLion, a well-funded, fintech start-up with considerable expertise in small-dollar, high-interest-rate borrowing. Electronic documents are transmitted to an Ishwaaswi/LDF Holdings representative on LDF tribal soil in Wisconsin, who makes *pro forma* reviews and approves the loan while technically on the LDF reservation. The loans are then funded from bank accounts controlled by MoneyLion and to which Ishwaaswi/LDF Holdings have no access. The loans are serviced and collected by MoneyLion's employees and contractors, off the LDF Tribe's reservation.

216.    MoneyLion, with the knowledge, aid, and complicity of LDF Holdings and Ishwaaswi, became an agent or authorized service provider for Ishwaaswi/Radiant Cash from Clarity and Experian, as well as other similar CRAs.

217.    Yet again, such arrangement allowed everyone involved to have sufficient legal cover – to wit, MoneyLion, Experian, Clarity, LDF Holdings and Ishwaaswi. Now, more "tribal" payday loans could be issued, resulting in more profits for all of the above at the expense of consumers.

218.    On August 30, 2018, MoneyLion, as agent or service provider for Ishwaaswi/LDF Holdings, obtained Mr. Cox's CBRs from Clarity and Experian. A record of the inquiry was recorded by Experian; Experian, apparently, recorded no address or phone number associated with the inquiry. **SEE PLAINTIFF'S EXHIBIT M.**

219.    Mr. Cox discovered the inquiry upon review of his July 16, 2020, Experian consumer disclosure.

220.    Mr. Cox never applied for credit with MoneyLion, Ishwaaswi, Radiant Cash, or any related entity. Rather, MoneyLion purchased Mr. Cox's personal information from an online lead generator which was, upon information and belief, ITMedia. ITMedia operates many dubious data-harvesting websites, including PersonalLoans.com, BadCreditLoans.com, and others.

221.    MoneyLion, with the aid, knowledge and consent of LDF Holdings and Ishwaaswi, obtained the CBRs under false pretenses and without permissible purpose. MoneyLion claimed Ishwaaswi was the actual end user of the report, although Ishwaaswi had no use for the report as it was not involved in any meaningful way concerning loan underwriting.

222.    However, LDF Holdings and Ishwaaswi were compensated by MoneyLion for their complicity and authorization allowing CBRs to be pulled in their name. As such, LDF Holdings and Ishwaaswi are jointly and severally liable under the FCRA.

**CheckAdvanceUSA.net Buys Data from PersonalLoans.com, Obtains New Report**

223.   Immediately after obtaining Mr. Cox's Experian credit history, PersonalLoans.com sold Mr. Cox's personal information to CheckAdvanceUSA.net, an online payday lender who lends at rates of 800% annual interest and higher.

224.   CheckAdvanceUSA.net claims to be owned by the "Wakpamni Lake Community Corporation ("**WLCC**"), a tribal corporation wholly owned by the Wakpamni Lake Community."

225.   WLCC states that it is "incorporated under and governed by the laws of the Oglala Sioux," although it notes it "operates independently of the Oglala Sioux Tribe."

226.   WLCC was established by Raycen American Horse Raines in 2012, when he persuaded certain members of the Oglala Sioux Tribe to act as a payday lending "cover" for a non-tribal entity based in Arizona called Cash Cloud, LLC ("**Cash Cloud**").

227.   Raines' pitch was straight-forward: the Oglala Sioux Tribe would use their sovereign immunity to shield Cash Cloud from state law restrictions on usurious interest rates.

228.   In return, Cash Cloud would pay a fee of $5 per new loan to the Oglala Sioux Tribe, and if more than $100,000 of fees per month were earned, the rate would then be lowered to $2.50 per loan.

229.   Cash Cloud would make loans to consumers at rates of more than 782% annual interest per year.

230.    Cash Cloud was owned by Chad Jardine ("**Jardine**") and Blake Collins ("**Collins**"), neither of whom are members of the Oglala Sioux nor any Indian tribe.

231.    Jardine and Collins originally set up an online lending company called Flobridge in 2009.

232.    By 2010, the State of Idaho had issued a cease-and-desist order, as the entity's websites were issuing payday loans without a license and illegally attempted to garnish the wages of non-paying customers.

233.    Jardine and Collins then set up Cash Cloud and sought the cloak of tribal sovereign immunity to protect their operations. However, the Oglala Sioux Tribe would have virtually no involvement in the actual business of making loans to consumers.

234.    The beneficial owners of CheckAdvanceUSA.net, with the aid of Raines and others connected to WLCC, concocted a sham agency/authorized service provider agreement to facilitate obtaining credit reports from Clarity and Experian.

235.    Yet again, the CRAs were able to document the business activities of the lender by having their inspectors arrive at the offices of the beneficial owners. Had these inspectors arrived in rural South Dakota, they would have found no such offices as no lending activity actually transpires on Oglala Sioux tribal land.

236.    After purchasing Mr. Cox's information from PersonalLoans.com, the beneficial owners of CheckAdvanceUSA.net electronically shipped the report to Infinity for underwriting analysis.

237.    Infinity is a "back end" services vendor who provides software to analyze, underwrite, service, and collect payday loans. Its website homepage prominently features

screenshots of sample payday lending software, with a stock photo of a middle-aged couple smiling near the banner headline of "$500 Cash Loan." **SEE PLAINTIFF'S EXHIBIT LL.**

238.   Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are lending." *See infinityels.com*.

239.   Domain registration records show InfinityELS.com is registered to Chris Leyva, 910 Roberta Lane, Sparks, NV 89431, email general@paydayloanmanager.com. **SEE PLAINTIFF'S EXHIBIT MM.**

240.   Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans." **SEE PLAINTIFF'S EXHIBIT NN.**

241.   Leyva designed Infinity's payment processing system specifically to cater to the needs of non-tribal businesses who had engaged in "rent-a-tribe" agreements. Leyva bills himself as an expert in online payday lending and has given speeches and lectures at industry conferences sponsored by the largest industry trade group, the Online Lenders Alliance.

242. Infinity's website, infinityELS.com, as well as paydayloanmanager.com, are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156. **SEE PLAINTIFF'S EXHIBIT OO.**

243. CheckAdvanceUSA.net has the identical IP and, for the last 10 years, has been hosted on Infinity's server. This address corresponds to a physical location west of Wichita, Kansas, meaning that the entire lending operation is hundreds of miles from WLCC's tribal land. *Id.*

244. The FCRA, in addition to prohibiting any person from obtaining a CBR without permissible purpose, prohibits any person from *using* such report without permissible purpose.

245. Infinity and Leyva are fully aware that the reports obtained by many of their clients, including CheckAdvanceUSA.net, are obtained via marketing leads from lead generators like ITMedia which frequently results in CBRs being pulled without permissible purpose. Infinity's underwriting software specifically analyzes how the lead was obtained; thus, it would be impossible for Infinity and Leyva not to know of the illegal provenance of many of the reports analyzed.

246. Infinity thus knew that Mr. Cox's information had been obtained *vis-à-vis* PersonalLoans.com without the consent of Mr. Cox.

### Creditserve, Niizhwaaswi and LDF Holdings

255. LDF Holdings also rents its immunity to Eric Welch and his company, Creditserve.

256.    Welch and Creditserve lend through www.loanatlast.com and the tribal limited liability company, Niizhwaaswi. Welch and Creditserve are the true beneficial owners and servicers of the usurious loans issued through Loan At Last and Niizhwaaswi.

257.    Welch is a veteran of payday lending and owns, or owned, many payday lending companies, including Helping Hand Financial, Inc. ("**Helping Hand**"), which did business in Texas as CashCash, Inc.

258.    Around January 2015, Welch purchased the domain name www.loanatlast.com, evidencing his ownership and control of the lending website.

259.    Calling the main – and only – customer service phone number listed on Loan At Last's website, 844-676-8550, in August 2020 resulted in a representative answering the phone in the name of Loan At Last. When asked if the caller had reached Creditserve, the representative quickly confirmed, "yes."

260.    Creditserve, with the assistance and complicity of Niizhwaaswi and LDF Holdings, was made the agent or authorized service provider for Loan At Last with various CRAs, including ChexSystems.

261.    Underwriting based on CRA data is performed by Creditserve or its contractors. If the consumer is approved, and elects to take out the loan, then electronic loan data is sent to an LDF Holdings employee in Wisconsin who electronically rubber-stamps and thus "approves" the loan on tribal land. The loan is then funded with money controlled by Welch and Creditserve, and consumer payments are collected by Creditserve.

262.    On August 15, 2016, Creditserve, as agent or authorized service provider for Loan At Last, obtained a CBR regarding Mr. Cox from ChexSystems. ChexSystems recorded the inquiry as having been made by "CREDITSERV/LOANATLAST," located in Los Angeles, CA 90038-3989. **SEE PLAINTIFF'S EXHIBIT PP.**

263.    Mr. Cox discovered the inquiry upon reviewing his FactorTrust consumer credit disclosure in August 2020.

264.    Crediserve, with the aid, knowledge and consent of LDF Holdings and Niizhwaaswi, obtained the CBR under false pretenses and without permissible purpose. Crediserve claimed Niizhwaaswi was the actual end user of the report, although it had no use for the report as it was not involved in any meaningful way concerning loan underwriting. As in previous examples, Mr. Cox's personal information was purchased from an online lead generator.

265.    LDF Holdings and Niizhwaaswi were compensated by Crediserve and Welch for their complicity and authorization allowing CBRs to be pulled in their name. LDF Holdings and Niizhwaaswi provided false blanket certifications to the CRAs claiming Creditserve and Welch were their agents and were obtaining reports for LDF Holdings and Niizhwaaswi to use even though LDF Holdings and Niizhwaaswi knew they would not be using the reports. As such, LDF Holdings and Niizhwaaswi are jointly and severally liable under the FCRA.

266.    Mr. Cox has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FCRA – *MDC and Bedco*

267.   Mr. Cox incorporates Paragraphs 1 – 266 as if fully restated herein.

268.   MDC and Bedco violated **15 U.S.C. § 1681b(f)** when they, as Minto Money, knowingly obtained CBRs from Clarity and Experian without any permissible purpose by certifying the requests were in connection with an alleged *credit transaction* between Mr. Cox and Minto Money, when Mr. Cox had no business or loan with Minto Money, nor had he made any application for such loan.

269.   MDC and Bedco violated **15 U.S.C. § 1681q** when they obtained Mr. Cox's CBR under false pretenses, claiming Minto Money in Minto, Alaska, was the true end user of the report, when Isaacson and his non-tribal employees or contractors were.

270.   Assuming, *arguendo,* that Mr. Cox had applied for a loan with Minto Money, such loan would have been *void ab initio* due to Florida's usury laws, and Isaacson, MDC and Bedco still would not have permissible purpose to obtain a CBR.

271.   Assuming, *arguendo,* that Mr. Cox had applied for a loan with Minto Money, MDC and Bedco would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since MDC and Bedco were not obtaining the information in response to any actual request by Mr. Cox but rather for pre-screening or marketing purposes, to simply ascertain if Mr. Cox would be a good "lead" to whom to market usurious loans.

272.   MDC and Bedco are thus jointly and severally liable for the above-stated violations.

273.   As a result of their conduct, MDC and Bedco are liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Honorable Court to enter judgment against MDC and Bedco, jointly and severally, for:

a.      The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.      Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.      Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.      Such other relief that this Court deems just and proper.

## COUNT II
### VIOLATIONS OF THE FCRA – *Tactical and 777 Partners*

274.   Mr. Cox incorporates Paragraphs 1 – 266 as if fully restated herein.

275.   Tactical and 777 Partners violated **15 U.S.C. § 1681b(f)** when they, as purported agents or authorized service provides for Zocaloans, knowingly obtained two CBRs from Clarity and two CBRs from Experian without any permissible purpose by certifying the requests were in connection with an alleged *credit transaction* between Mr.

Cox and ZocaLoans, when Mr. Cox had no business or loan with ZocaLoans, nor had he made any application for such loan.

276.   Tactical and 777 Partners violated **15 U.S.C. § 1681q** when they, as purported agents or authorized service provides for Zocaloans, knowingly obtained Mr. Cox's CBRs under false pretenses, claiming Rosebud Lending LZO was the end user of the report, when the true end users were Tactical, 777 Partners and their non-tribal employees or contractors.

277.   Assuming, *arguendo,* that Mr. Cox had applied for a loan with ZocaLoans, such loan would have been *void ab initio* due to Florida's usury laws, and Tactical and 777 Partners still would not have permissible purpose to obtain a CBR.

278.   Assuming, *arguendo,* that Mr. Cox had applied for a loan with ZocaLoans or similar, Tactical and 777 Partners would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since Tactical and 777 Partners were not obtaining the information in response to any actual request by Mr. Cox but rather for pre-screening or marketing purposes, to simply ascertain if Mr. Cox would be a good "lead" to whom to market usurious loans.

279.   Tactical and 777 Partners are thus jointly and severally liable for the above-stated violations.

280.    As a result of their conduct Tactical and 777 Partners are liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Honorable Court to enter judgment against Tactical and 777 Partners, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$4,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

## COUNT III
## VIOLATIONS OF THE FCRA – *Midaaswi and LDF Holdings*

281.    Mr. Cox incorporates Paragraphs 1 – 266 as if fully restated herein.

282.    Midaaswi and LDF Holdings violated **15 U.S.C. § 1681b(f)** when they knowingly authorized, condoned, and participated in the beneficial owners of National Small Loan obtaining CBRs from Clarity and Experian without any permissible purpose, certifying to Experian and Clarity that the requests were in connection with an alleged *credit transaction* between Mr. Cox and National Small Loan, when Mr. Cox had no

business or loan with National Small Loan, nor had Mr. Cox even heard of National Small Loan prior to reviewing his Experian consumer disclosure.

283.    Assuming, *arguendo,* that Mr. Cox had applied for a loan with National Small Loan, such loan would have been *void ab initio* due to Florida's usury laws, and Midaaswi and LDF Holdings still would not have permissible purpose to obtain a CBR.

284.    Assuming, *arguendo,* that Mr. Cox had applied for a loan with National Small Loan, Midaaswi and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since National Small Loan was not obtaining the information in response to any actual request by Mr. Cox but rather for pre-screening or marketing purposes, to simply ascertain if Mr. Cox would be a good "lead" to whom to market usurious loans.

285.    Midaaswi and LDF Holdings are thus jointly and severally liable for the above-stated violations, as they are liable for the acts of their agent/authorized service provider, acting within the scope and authority of the agency granted to it by Midaaswi and LDF Holdings.

286.    As a result of their conduct, Midaaswi and LDF Holdings are liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Honorable Court to enter judgment against Midaaswi and LDF Holdings, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

### COUNT IV
### VIOLATIONS OF THE FCRA – *Ishwaaswi, LDF Holdings and MoneyLion*

287.   Mr. Cox incorporates Paragraphs 1 – 266 as if fully restated herein.

288.   Ishwaaswi, MoneyLion and LDF Holdings violated **15 U.S.C. § 1681b(f)** when MoneyLion obtained CBRs from Clarity and Experian without any permissible purpose, and Ishwaaswi and LDF Holdings knowingly authorized, condoned, facilitated and participated in the scheme. MoneyLion certified to Experian and Clarity its requests, ostensibly on behalf of the end user, Ishwaaswi/LDF Holdings, were in connection with an alleged *credit transaction* between Mr. Cox and Radiant Cash, when Mr. Cox had no business or loan with Radiant Cash, nor had Mr. Cox even heard of Radiant Cash prior to reviewing his Experian consumer disclosure. Ishwaaswi, MoneyLion and LDF Holdings were all aware that Mr. Cox's information had been purchased from a lead generator and that no permissible purpose to obtain CBRs existed.

289.   Ishwaaswi, MoneyLion and LDF Holdings violated **15 U.S.C. § 1681q** when MoneyLion, as agents or authorized service provides for Ishwaaswi and LDF Holdings, knowingly obtained Mr. Cox's CBRs under false pretenses, claiming Ishwaaswi was the end user of the report, when the true end user was MoneyLion.

290.   Ishwaaswi and LDF Holdings allowed MoneyLion to request reports from CRAs knowing that they had falsely certified that Ishwaaswi was the end user of the report. Ishwaaswi and LDF Holdings aided and facilitated this by signing blanket certifications to the CRAs that Ishwaaswi was the legitimate end user of the reports and that it would strictly monitor and ensure compliance with the FCRA by its agent or service provider, MoneyLion.

291.   Thus, pursuant to agreements signed by Ishwaaswi and LDF Holdings, MoneyLion was an agent for Ishwaaswi and LDF Holdings and was acting within the scope of its agency and, according to the agreements, were under the direction and control of Ishwaaswi and LDF Holdings. As such, Ishwaaswi and LDF Holdings are jointly and severally liable for the actions of MoneyLion.

292.   Assuming, *arguendo,* that Mr. Cox had applied for a loan with Radiant Cash, such loan would have been *void ab initio* due to Florida's usury laws, and Ishwaaswi, MoneyLion and LDF Holdings still would not have permissible purpose to obtain a CBR.

293.   Assuming, *arguendo,* that Mr. Cox had applied for a loan with Radiant Cash, Ishwaaswi, MoneyLion and LDF Holdings would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is

obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since MoneyLion was not obtaining the information in response to any actual request by Mr. Cox but rather for pre-screening or marketing purposes, to simply ascertain if Mr. Cox would be a good "lead" to whom to market usurious loans.

294.   As a result of their conduct, Ishwaaswi, MoneyLion and LDF Holdings are liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Honorable Court to enter judgment against Ishwaaswi, MoneyLion and LDF Holdings, jointly and severally, for:

a.     The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.     Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.     Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.     Such other relief that this Court deems just and proper.

## COUNT V
## VIOLATIONS OF THE FCRA – *ITMedia*

295.   Mr. Cox incorporates paragraphs 1 – 266 as if fully stated herein.

296.    ITMedia violated **15 U.S.C. § 1681b(f)** when it obtained Mr. Cox's credit report from Experian without permissible purpose, as ITMedia, under the guise of PersonalLoans.com, stated it needed the CBR in connection with an "account review" regarding a "credit transaction," but no account existed. Mr. Cox never applied for, much less obtained, any credit from PersonalLoans.com or any entity related to ITMedia, and Mr. Cox never consented to ITMedia obtaining a credit report regarding him.

297.    ITMedia used Mr. Cox's confidential information obtained from Experian to try to discern Mr. Cox's financial situation for the purpose of re-selling his information to various online payday loan sharks, to assist them in making illegal and usurious loans to Mr. Cox at interest rates that far exceed the maximum lawful rate in Florida.

298.    ITMedia knew or should have known that it lacked a permissible purpose when requesting Mr. Cox's credit report, as it did not have his consent and, even assuming, *arguendo*, he had consented, ITMedia obtained such consent under false pretenses, by failing to disclose that it intended to re-sell his personal information to illegally operating online loan sharks.

299.    ITMedia violated **15 U.S.C. § 1681b(f)** when it obtained Mr. Cox's credit report and then used it for purposes other than those specified on at least **four separate occasions**, when it re-sold data contained in the reports to CheckAdvanceUSA.net, Radiant Cash, CNU Online Holdings, and American Web Loan.

300.    ITMedia violated **15 U.S.C. §§ 1681e(e)(1)(A)** and **1681e(e)(2)(A)(i)** when it obtained Mr. Cox's credit report from Experian and then re-sold data contained within the report to CheckAdvanceUSA.net, Radiant Cash, CNU Online Holdings, and

American Web Loan. At no point did ITMedia disclose to Experian that it intended to act as a re-seller of credit reports nor did it disclose the end users of the report it obtained as required by this subsection. ITMedia could not have possibly needed the information for its own purposes as it does not, pursuant to its website's own disclosures, engage in any direct lending.

301.   As a result of its conduct, ITMedia is liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Court to enter judgment against ITMedia, and for him, as follows:

a.   The greater of statutory damages of **$1,000.00** per incident (for a total of **$9,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages;

b.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.   Such other relief that this Court deems just and proper.

### COUNT VI
### VIOLATIONS OF THE FCRA – *Niizhwaaswi, LDF Holdings, and Creditserve*

302.   Mr. Cox incorporates Paragraphs 1 – 266 as if fully restated herein.

303.   Niizhwaaswi, LDF Holdings, and Creditserve violated **15 U.S.C. § 1681b(f)** when Creditserve obtained a CBR from ChexSystems without any permissible purpose, and Niizhwaaswi and LDF Holdings knowingly authorized, condoned, facilitated and participated in the scheme. Creditserve certified to Experian and Clarity its requests, ostensibly on behalf of the end user, Niizhwaaswi/LDF Holdings, were in

connection with an alleged *credit transaction* between Mr. Cox and Loan At Last, when Mr. Cox had no business or loan with Loan At Last, nor had Mr. Cox even heard of Loan At Last prior to reviewing his FactorTrust consumer disclosure. Niizhwaaswi, LDF Holdings, and Creditserve were all aware Mr. Cox's information had been purchased from a lead generator and that no permissible purpose existed to obtain a CBR regarding him.

304.    Niizhwaaswi, LDF Holdings, and Creditserve violated **15 U.S.C. § 1681q** when Creditserve, as agents or authorized service provides for Niizhwaaswi and LDF Holdings, knowingly obtained Mr. Cox's CBR under false pretenses, claiming Niizhwaaswi was the end user of the report, when Creditserve was the true end user.

305.    Niizhwaaswi and LDF Holdings allowed Creditserve to request reports from CRAs knowing Creditserve would falsely certify that Niizhwaaswi was the end user of the report. Niizhwaaswi and LDF Holdings aided and facilitated this conduct by signing blanket certifications to the CRAs, claiming Niizhwaaswi was the legitimate end user of the reports and that it would strictly monitor and ensure compliance with the FCRA by its agents or service providers, Creditserve.

306.    Thus, pursuant to agreements signed by Niizhwaaswi and LDF Holdings, Creditserve was agent or authorized service provider for Niizhwaaswi and LDF Holdings and was acting within the scope of its agency and, according to the agreements, were under the direction and control of Niizhwaaswi and LDF Holdings. As such, Niizhwaaswi and LDF Holdings are jointly and severally liable for the actions of Creditserve.

307. Assuming, *arguendo,* that Mr. Cox had applied for a loan with Loan At Last, such loan would have been *void ab initio* due to Florida's usury laws, and Niizhwaaswi, LDF Holdings, and Creditserve still would not have permissible purpose to obtain a CBR.

308. Assuming, *arguendo,* that Mr. Cox had applied for a loan with Loan At Last, Niizhwaaswi, LDF Holdings, and Creditserve would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since they were not obtaining the information in response to any actual request by Mr. Cox but rather for pre-screening or marketing purposes, to simply ascertain if Mr. Cox would be a good "lead" to whom to market usurious loans.

309. As a result of their conduct, Niizhwaaswi, LDF Holdings, and Creditserve are liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Honorable Court to enter judgment against Niizhwaaswi, LDF Holdings and Creditserve, jointly and severally, for:

a.     The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.      Punitive damages for intentional violation of the Act, pursuant to 15

U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.      Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3)

and/or 15 U.S.C. §1681o(a)(2); and,

d.      Such other relief that this Court deems just and proper.

### COUNT VII
### VIOLATIONS OF THE FCRA – *Infinity*

310.    Mr. Cox incorporates Paragraphs 1 – 266 as if fully restated herein.

311.    Infinity violated **15 U.S.C. § 1681b(f)** when it knowingly used a report

obtained   from   Clarity   and   Experian   without   permissible   purpose   by

CheckAdvanceUSA.net, a client of Infinity and whose website resides on servers owned

by Infinity.

312.    Infinity was fully aware that CheckAdvanceUSA.net has a sham rent-a-

tribe agreement with WLCC – an entity which the Oglala Sioux Tribe itself publicly

states does not represent its interests. Moreover, Infinity, who hosts, maintains, and acts

as agent for CheckAdvanceUSA.net, was aware that CheckAdvanceUSA.net has very

little organic web traffic, and the vast majority of its business comes from leads

purchased from online lead generators like ITMedia who themselves operate outside the

boundaries of the FCRA.

313.    When Infinity used the information in Mr. Cox's Clarity and Experian

CBRs, it was aware that it had no permissible purpose under the FCRA to use such

information. Leyva programmed Infinity's systems to process information anyway, without regard to its illegal provenance.

314.    Assuming, *arguendo,* that Mr. Cox had applied for a loan with CheckAdvanceUSA.net, such loan would have been *void ab initio* due to Florida's usury laws, and Infinity still would not have permissible purpose to use the CBRs.

315.    As a result of its conduct, Infinity is liable to Mr. Cox pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Cox respectfully requests this Honorable Court to enter judgment against Infinity for:

a.      The greater of statutory damages of **$1,000.00** per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Cox's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.      Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.      Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.      Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Cox hereby demands a jury trial on all issues so triable.

Respectfully submitted on **November 2, 2020**, by:

**SERAPH LEGAL, P. A.**

/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar No.: 1015954
BMorgan@SeraphLegal.com
/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
Florida Bar No.: 118103
TBonan@SeraphLegal.com
2002 E. 5th Avenue, Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Attorneys for Plaintiff*

## ATTACHED EXHIBIT LIST

A   LinkedIn Profile of Doug Isaacson, Accessed May 16, 2020
B   Image of 597 Peace Pipe Rd., Lac du Flambeau, WI 54538
C   LDF Holdings Website – Operations Team Excerpt, Accessed April 30, 2020
D   LinkedIn Profile of Jessi Lorenzo, Accessed April 30, 2020
E   National Small Loan Website, Accessed October 5, 2020
F   Radiant Cash Website, Accessed August 19, 2020
G   Loan At Last Website, Accessed April 30, 2020
H   Minto Financial's Lending License
I   Domain Name Registration for bedco.us, Record Date: December 19, 2018
J   Isaacson Responses to Consumer Complaints on BBB regarding Minto Money
K   Screenshot of mintodevelopmentcorp.com, Accessed October 6, 2020
L   Screenshot of bedco.us, Accessed May 16, 2020
M   Plaintiff's Experian Consumer Disclosure, July 16, 2020, Inquiries Excerpt
N   Hillsborough County Resident's Loan Agreement with ZocaLoans
O   Domain Name Registration for zocaloans.com, Record Date: July 21, 2019
P   Unrelated Consumer's ChexSystems Disclosure, Inquiries Excerpt
Q   Unrelated Consumer's FactorTrust Disclosure, Inquiries Excerpt

**ATTACHED EXHIBIT LIST (CONT.)**

| | |
|---|---|
| R | Unrelated Consumer's Trans Union Disclosure, Inquiries Excerpt |
| S | Domain Name Registration for nationalsmallloan.com, Record Date: October 31, 2014 |
| T | 2020 Foreign Profit Corporation Annual Report for Strategic Funding Partners, Inc. |
| U | Internet Archive of NationalSmallLoan.com as it appeared on July 6, 2015 |
| V | Screenshot of Nationalpayday.com from August 15, 2020 |
| W | Screenshot of NationalSmallLoan.cm from August 2020 |
| X | Articles of Incorporation for Cash Now, Inc. |
| Y | Agreement of Merger Between Cash Now, Inc., and ITMedia |
| Z | PersonalLoans.com, "Example of a Personal Loan APR Range" |
| AA | FTC Warning Letter to ITMedia, May 14, 2020 |
| BB | Former ITMedia Employee's Description of the Company, LinkedIn Profile Excerpt |
| CC | Unrelated Consumer's Experian Consumer Disclosure, Inquiries Excerpt |
| DD | Domain Name Registration Record for radiantcash.com |
| EE | Archived Webpage for LionLoans.com |
| FF | BBB Webpage Showing MoneyLion Address in South Dakota |
| GG | 2014 Article on Dakota Service Center CEO Carol Laib |
| HH | LinkedIn Profile of Carol Laib, Excerpt |
| II | LinkedIn Profile of Christopher Loganathan, Excerpt |
| JJ | Blog and LinkedIn Profile of Thinegan Ratnam, Excerpt |
| KK | Radiant Cash's IP Address Server Location |
| LL | Home page for infinityels.com |
| MM | Domain Name Registration Record for infinityels.com |
| NN | Archived webpage for paydayloanmanager.com, February 23, 2015 |
| OO | Infinity's Server Used for Multiple Payday Loan Websites |
| PP | Plaintiff's FactorTrust Consumer Disclosure, August 7, 2020, Additional Information from ChexSystems, Excerpt |